FILED IN OPEN COURT

5-15-12

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CLERK. U S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:11-cr-5(S2)-J-20JRK

KRYSTOPHER LEGG

## PLEA AGREEMENT

**A.**    **Particularized Terms**

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Robert E.

O'Neill, United States Attorney for the Middle District of Florida, and the defendant,

Krystopher Legg, and the attorney for the defendant, Tom Bell, Esq., mutually agree as

follows:

1.    Count(s) Pleading To

The defendant shall enter a plea of guilty to Count One of the Superseding

Indictment, which charges the defendant with conspiracy to distribute and dispense

oxycodone, a Schedule II controlled substance, in violation of Title 21, United States

Code, Sections 841(a)(1) and 841(b)(1)(C).

Defendant's Initials _____                    AF Approval _____

2.    Maximum Penalties - Section 851 Enhancement

Count One is punishable by a term of imprisonment of up to thirty (30) years, a

fine of not more than $2,000,000, or both the term of imprisonment and the fine, a term

of supervised release of at least six (6) years, and a mandatory special assessment of

$100, said special assessment to be due on the date of sentencing. A violation of the

terms and conditions of supervised release carries a maximum sentence of not more

than two (2) years of imprisonment as well as the possibility of an additional term of

supervised release.

Further, the Defendant stipulates and agrees that he shall be subject to the

referenced increased penalty under 21 U.S.C. § 841(b)(1)(C) because the defendant

has a prior conviction for a felony drug offense. Pursuant to 21 U.S.C. § 851(b), the

Defendant affirms and stipulates that he has been convicted of the following felony drug

offense prior to the commission of the offense alleged in Count One of the Superseding

Indictment, and that said conviction has become final:

> 1.    On or about September 19, 2007, in the Court of Common Pleas,
> Vinton County, Ohio, Case No. 06 CR 7720, possession of drugs
> (crack cocaine), in violation of R.C. 2925.11(A)/2925.11(C)(4)(b).

In addition, the Defendant agrees that the certified copy of that conviction

attached to the Information to Establish Prior Convictions Pursuant to 21 U.S.C. § 851

("the Information") (Docs. 299 and 299-1) is true, valid and correct; that said conviction

was lawfully entered; that the Defendant will not challenge that conviction and, by this

plea agreement, expressly waives any challenges to that conviction he may have,

whether by direct appeal, collateral attack, or post-conviction proceedings; and that the

Defendant affirms and will reaffirm after conviction and prior to sentencing on Count

Defendant's Initials _____                    2

Second *handwritten annotation* TO KL

One of the Superseding Indictment that he has been previously convicted as alleged in the Information.

3.   Elements of the Offense(s)

The elements of an offense in violation of Title 21, United States Code, Sections

Second TO KL JT

841(a)(1) and 841(b)(1)(C), Count One of the Superseding Indictment, are:

> First:   That two or more people in some way agreed to try to accomplish a shared and unlawful plan to distribute and dispense oxycodone, a Schedule II controlled substance; and

> Second:   That the defendant knew the unlawful purpose of the plan and willfully joined in it.

4.   Count(s) Dismissed

TO KL
*handwritten annotation* Second (ATD)

At the time of sentencing, the remaining count in the Superseding Indictment against defendant Krystopher Legg, Count Two, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5.   Base Offense Level - USSG § 2D1.1(c)

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant stipulate and agree that the defendant's base offense level be calculated at 38 pursuant to USSG §§ 2D1.1 and 1B1.3. The defendant understands that this stipulation and agreement is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

6.   Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment

Defendant's Initials _____                3

for acceptance of responsibility, pursuant to USSG §3E1.1(a).  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant complies with the provisions of USSG §3E1.1(b), the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level.  The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agree that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

7.      Cooperation - Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing

Defendant's Initials _____        4

recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8.     Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

9.     Cooperation - Responsibilities of Parties

a.     The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the

Defendant's Initials _K P_          5

government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)    The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)    The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby

Defendant's Initials _____                6

waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)    The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)    The government may use against the defendant its own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)    The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

10.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. § 853, whether in the possession or control of the United States

Defendant's Initials _____                    7

or in the possession or control of the defendant or defendant's nominees.  The assets to be forfeited specifically include, but are not limited to, the following:

> a. Property constituting and derived from any proceeds the defendant obtained, directly or indirectly, as the result of such violations; and
>
> b. Property used and intended to be used in any manner or part to commit or to facilitate the commission of such violations.

The defendant agrees and consents to the forfeiture of these assets, if any, pursuant to any federal criminal, civil, and/or administrative forfeiture action.  The defendant also hereby agrees that the forfeiture described herein is not excessive and, in any event, the defendant waives any constitutional claims that the defendant may have that the forfeiture constitutes an excessive fine.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property, if any, sought by the government.  Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea agreement, the court make a determination that the government has established the requisite *nexus* between the property subject to forfeiture, if any, and the offense(s) to which defendant is pleading guilty and enter a preliminary order of forfeiture.  Pursuant to Rule 32.2(b)(4)(A), the defendant agrees that the preliminary order of forfeiture shall be final as to the defendant at the time it is entered, notwithstanding the requirement that it be made a part of the sentence and be included in the judgment.

Defendant's Initials             8

The defendant agrees to forfeit all interest in the properties described above, if any, and to take whatever steps are necessary to pass clear title to the United States. These steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Defendant further agrees to take all steps necessary to locate property and to pass title to the United States before the defendant's sentencing. To that end, defendant agrees to fully assist the government in the recovery and return to the United States of any assets, or portions thereof, as described above, if any, wherever located. The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.

The defendant agrees that the United States is not limited to forfeiture of the property described above, if any. If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above. This Court shall retain jurisdiction to settle any disputes arising from application of this

Defendant's Initials             9

clause. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

## B. **Standard Terms and Conditions**

### 1. Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1) (limited to offenses committed on or after April 24, 1996); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663 (limited to offenses committed on or after November 1, 1987) or § 3579, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. On each count to which a plea of guilty is entered, the Court shall impose a special assessment, to be payable to the Clerk's Office, United States District Court, and due on date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

Defendant's Initials _____          10

2.    <u>Supervised Release</u>

The defendant understands that the offense(s) to which the defendant is

pleading provide(s) for imposition of a term of supervised release upon release from

imprisonment, and that, if the defendant should violate the conditions of release, the

defendant would be subject to a further term of imprisonment.

3.    <u>Sentencing Information</u>

The United States reserves its right and obligation to report to the Court and the

United States Probation Office all information concerning the background, character,

and conduct of the defendant, to provide relevant factual information, including the

totality of the defendant's criminal activities, if any, not limited to the count(s) to which

defendant pleads, to respond to comments made by the defendant or defendant's

counsel, and to correct any misstatements or inaccuracies. The United States further

reserves its right to make any recommendations it deems appropriate regarding the

disposition of this case, subject to any limitations set forth herein, if any.

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the

defendant agrees to complete and submit, upon execution of this plea agreement, an

affidavit reflecting the defendant's financial condition. The defendant further agrees,

and by the execution of this plea agreement, authorizes the United States Attorney's

Office to provide to, and obtain from, the United States Probation Office or any victim

named in an order of restitution, or any other source, the financial affidavit, any of the

defendant's federal, state, and local tax returns, bank records and any other financial

information concerning the defendant, for the purpose of making any recommendations

Defendant's Initials           11

to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.

4.    <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

5.    <u>Defendant's Waiver of Right to Appeal and</u>
<u>Right to Collaterally Challenge the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence or to challenge it collaterally (such as through a motion pursuant to 28 U.S.C. § 2255) on any ground, including the ground that the Court erred in

Defendant's Initials                     12

determining the applicable guidelines range pursuant to the United States Sentencing

Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable

guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing

Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or

(c) the ground that the sentence violates the Eighth Amendment to the Constitution;

provided, however, that if the government exercises its right to appeal the sentence

imposed, as authorized by Title 18, United States Code, Section 3742(b), then the

defendant is released from his waiver and may appeal the sentence as authorized by

Title 18, United States Code, Section 3742(a).

6. <u>Middle District of Florida Agreement</u>

It is further understood that this agreement is limited to the Office of the United

States Attorney for the Middle District of Florida and cannot bind other federal, state, or

local prosecuting authorities, although this office will bring defendant's cooperation, if

any, to the attention of other prosecuting officers or others, if requested.

7. <u>Filing of Agreement</u>

This agreement shall be presented to the Court, in open court or <u>in camera</u>, in

whole or in part, upon a showing of good cause, and filed in this cause, at the time of

defendant's entry of a plea of guilty pursuant hereto.

8. <u>Voluntariness</u>

The defendant acknowledges that defendant is entering into this agreement and

is pleading guilty freely and voluntarily without reliance upon any discussions between

the attorney for the government and the defendant and defendant's attorney and

without promise of benefit of any kind (other than the concessions contained herein),

Defendant's Initials _____               13

and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial.  The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

9.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth in the attached

Defendant's Initials _____                    14

"Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

10.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

11.    Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _____ day of April, 2012.

ROBERT E. O'NEILL
United States Attorney

_____
KRYSTOPHER LEGG
Defendant

_____
A. TYSEN DUVA
Assistant United States Attorney

_____
TOM BELL, Esq.
Attorney for Defendant

_____
MAC D. HEAVENER, III
Assistant United States Attorney
Deputy Chief, Jacksonville Division

Defendant's Initials _____     15

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 3:11-cr-5(S1)-J-20JRK

KRYSTOPHER LEGG

## PERSONALIZATION OF ELEMENTS

1.     At some point between late 2009 and continuing through on or about July
29, 2010, at Jacksonville, Duval County, in the Middle District of Florida and elsewhere,
did you and others known and unknown to the grand jury in some way agree to try to
accomplish a shared and unlawful plan to distribute and dispense oxycodone, a
Schedule II controlled substance?

2.     Did you know the unlawful purpose of the plan and willfully join in it?

Defendant's Initials _____                16

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                            CASE NO.  3:11-cr-5(S1)-J-20JRK

KRYSTOPHER LEGG

## FACTUAL BASIS[1]

In early December 2009, Zachary Timothy Rose ("Rose") moved from South Florida to Jacksonville, Florida to open an illegitimate pain clinic business known as Jacksonville Pain and Urgent Care ("Jacksonville Pain"), then located at 1395 Cassat Avenue Suite 2, Jacksonville, Florida.  Rose opened Jacksonville Pain for the purpose of hiring doctors to work in the pain clinic business to prescribe pain medications, namely high dosages of 30 milligram and 15 milligram oxycodone pills, to patients seeking them.  Oxycodone, the generic name for a highly addictive painkiller, the abuse of which leads to severe psychological or physical dependence, is a Schedule II controlled substance, which is sold generically under a variety of brand names, including Roxicodone, Oxycontin, Percocet and Endocet.

In late 2009, Rose opened Jacksonville Pain to gain a strategic advantage over some rival pain clinic owners in the South Florida area.  Jacksonville Pain was incorporated on or about October 15, 2009 and was opened in early December 2009.

---

[1]The factual basis is prepared by the United States and does not include all of the facts relevant to the defendant's and other individuals' involvement in the crime to which the defendant is pleading guilty and other illegal activities in which the defendant may have been involved.

Defendant's Initials _____

In March 2010, Rose was evicted from the business location of Jacksonville Pain due to the large volume of people, many of whom were from outside the state of Florida, who congregated in the parking lot of Jacksonville Pain and that of the surrounding businesses.  Once Jacksonville Pain closed in early March 2010, the same ownership, staff and some of the same physicians relocated from Jacksonville Pain to a new clinic known as Duval Wellness Center, Inc. ("Duval Wellness"), located at 203-9A West 48th Street, Jacksonville, Florida 32208.  However, none of the client/patient files from Jacksonville Pain were transferred to the new physical location of Duval Wellness, despite that a significant number of the Jacksonville Pain clients/patients simply began going to Duval Welness once it opened. In addition, in early 2010, Rose opened another pain clinic in Jacksonville, Florida known as First Coast Pain and Urgent Care ("First Coast Pain"), located at 5834 Normandy Boulevard, Jacksonville, Florida 32205.

The typical individuals who went to Jacksonville Pain, Duval Wellness and First Coast Pain (hereinafter collectively the "Jacksonville pain clinics") were from outside the state of Florida, including but not limited to the states of Ohio, Kentucky and Tennessee.  In late 2009, Rose understood that he could create this strategic advantage over certain pain clinics in South Florida by eliminating over 600 miles of round trip drive time from these individuals' trip to Florida and still take advantage of running his clinic within the state of Florida.  Rose and others took steps to obtain patient lists from at least one rival South Florida pain clinic and then market directly to those individuals by informing them that they could save significant travel time by coming to Jacksonville Pain and still obtain the same levels of oxycodone they were accustomed to receiving from the pain clinics in South Florida.

Defendant's Initials _____        2

Rose's (and those working at his direction) direct solicitation of these "clients/patients," in fact, caused these clients/patients to travel to Jacksonville, Florida, instead of South Florida, to see the doctors that worked at Jacksonville Pain, its successor pain clinic, Duval Wellness, and also First Coast Pain.

In late 2009, Rose solicited Jenna Crawley ("Crawley"), who lived in South Florida, to join him in Jacksonville as a business partner in Jacksonville Pain (and later Duval Wellness). Crawley had the primary job of overseeing the day to day operations of Jacksonville Pain and Duval Wellness. Crawley was also responsible for overseeing First Coast Pain. Crawley worked for a period of months at the Jacksonville pain clinics and derived significant income from them. Crawley, at the direction of Rose, participated in the hiring of certain physicians and handled the documentation to ensure that these physicians could start working at the Jacksonville pain clinics to distribute oxycodone and other medications from their DEA issued numbers, which allowed the physicians to order controlled substance pain medications from pharmaceutical distributors. Crawley knew that a significant majority of the clients/patients traveling from hundreds of miles away to see the physicians at Jacksonville Pain, Duval Wellness and First Coast Pain were not legitimately in need of painkillers and simply knew that traveling to the Jacksonville pain clinics (instead of the longer drive to South Florida) would result in their obtaining the same significant levels of oxycodone and other narcotic medications they were accustomed to receiving in South Florida.

On or about December 14, 2009, as a result of the owner obtaining certain patient information from a rival South Florida clinic, individuals with an ownership interest in the South Florida clinic traveled to Jacksonville, Florida to confront and

Defendant's Initials  /S    3

threaten Rose and others associated with Jacksonville Pain.  The threats involved the South Florida clinic owners obtaining certain profits from Jacksonville Pain because of Rose's actions of "stealing" patients.  Various threats were made during this confrontation.  Ultimately, officers from the Jacksonville Sheriff's Office responded and state arrests were made.

Prior to and after this event, the out of state clients/patients continued to travel to Jacksonville Pain and its successor clinic, Duval Wellness, and later First Coast Pain to see the physicians working there in order to obtain prescriptions for significant amounts of the Schedule II controlled substance oxycodone (both in 30 milligram and 15 milligram dosages), as well as xanax and soma.  Xanax is a potent and fast acting benzodiazepine drug that acts as a sedative and its effects are exacerbated when combined with fast release high dosage opiates, such as 30 mg and 15 mg oxycodone tablets.  Soma is a barbituate drug (which is not a scheduled controlled substance) that, when used in conjunction with xanax, creates a markedly increased euphoria.  When 30 mg oxycodone, 15 mg oxycodone, xanax and soma are used in conjunction, the combination enhances the effects of each drug and substantially increases the chance for an overdose.  Physicians prescribing these medications at Jacksonville Pain, Duval Wellness and First Coast Pain prescribed these medications together without appropriate individual assessments of patients.

The overwhelming majority of the clients/patients who traveled to and visited Jacksonville Pain, Duval Wellness and First Coast Pain were uninsured and paid cash for each doctor's visit (between $250 and $300 per visit every thirty days), obtained and paid approximately $250 cash for a Magnetic Resonance Image ("MRI") (which

Defendant's Initials _____                    4

Jacksonville Pain, Duval Wellness and First Coast Pain also charged a $50 cash referral fee for the clients/patients to obtain an MRI) and then paid for the prescriptions themselves (typically about $500 to $750 for the different dosages of oxycodone and xanax and/or soma). It was common for a client/patient to pay an aggregate amount in excess of $1,000 cash per visit. The Jacksonville pain clinics only accepted cash. The Jacksonville pain clinics also filled prescriptions at the in house dispensary within the clinics and provided the oxycodone, xanax and soma directly to the clients/patients. A significant majority of these individuals complained to the doctors of back pain.

The owner paid the prescribing physicians at Jacksonville Pain, Duval Wellness and First Coast Pain a specific negotiated dollar amount per patient. This ranged from $40 to about $60 per patient. Some physicians treated upwards of 80 patients per day. Other physicians treated approximately 30 to 50 patients per day.

Another individual from South Florida partnered with the owner and co-owner of the Jacksonville pain clinics and parked a semi-trailer nearby some of the Jacksonville pain clinics, which contained a mobile MRI machine. Individuals managing and working at the Jacksonville pain clinics routinely referred the clients/patients to this individual for an MRI (which was done via one of the physician's prescriptions). The clients/patients paid the Jacksonville pain clinics in cash for the referral and then paid the owner of the MRI machine cash for the MRIs. While there was an MRI machine in this trailer and the clients/patients typically laid inside the machine for a period of 15 to 20 minutes to obtain some form of an MRI, there were instances when patients received no legitimate MRI and were merely provided a printout with their name on it and some impressions and findings concerning an MRI of an individual's back.

Defendant's Initials                     5

Rose hired approximately five (5) individuals at various times, including Ryan Young, Yengeny "Gene" Drubetskoy, Theodore Enquist, Brian Goldberg and Jason Votrobek, to assist in running the day to day operations of Jacksonville Pain, Duval Wellness and First Coast Pain. These individuals, in essence, ran the pain clinics and ensured that often in excess of one-hundred patients per day at each clinic saw the prescribing physicians in as orderly fashion as possible. The typical wait times that the clients/patients endured were substantial. Oftentimes, the clients/patients began lining up for their appointment days the night prior and during the early morning hours on their appointment day. Surveillance officers, cameras and cooperating witnesses saw individuals congregating in the parking lots at night and in the early morning hours and sleeping in the parking lots overnight waiting for their appointments. Syringes and other items consistent with drug use were found in the parking lots. The managers running the day to day operations of the Jacksonville pain clinics saw these vast crowds when they arrived to work and hired security guards to contain them.

Each day at Jacksonville Pain, Duval Wellness and First Coast Pain, owners and managers would collect the cash generated from the previous day and take the cash to SunTrust Bank for deposit. SunTrust bank records for Jacksonville Pain, Duval Wellness and First Coast Pain show that the daily cash deposits had the following range for each clinic: $12,130 - $92,613 (First Coast Pain), $14,020 - $166,509 (Duval Wellness) and $12,249 - $125,699 (Jacksonville Pain). The median deposit for the clinics was between $40,000 to $60,000 cash per day.

During the investigation, DEA and FBI agents and JSO officers used two confidential sources to make various consensual recordings of Rose, Dr. Hall, Dr. Perla,

Defendant's Initials                 6

Ryan Young, Theodore Enquist and Gene Drubetskoy. During numerous recordings, Rose referred to himself, among other things, as the "highest volume [oxycodone] dealer in Florida." On April 1, 2010, CS-1 made a consensual recording of Rose, Young and Enquist at First Coast Pain, during which Rose and Young explained, in substance, that it would be two years by the time "they" [law enforcement] inspected the Jacksonville clinics. Rose stated that this would likely start down south and that the Jacksonville clinics were not even a "blip" on the radar. Rose, Young and Enquist discussed opening nationally and stated that they were "shedding money." Rose explained that each patient gets at least "2 bottles" of medications and that the mark-up in the price of the medications was significant. They also discussed a person (Krystopher Legg - who is discussed below) who brought about 25 people per week to the clinics to obtain the medications. They even discussed that these individuals came in a bus.

Numerous other consensual recordings were made by CS-1 and another confidential source (CS-2). CS-1 introduced CS-2 to Rose, Dr. Hall and Dr. Perla. CS-2 had certain meetings with these various individuals. During one recorded meeting in mid April 2010, Dr. Hall told CS-2, among other things, "[w]e kinda get the feel of the DEA.... They are really after these clinics now because there are so many damn pain clinics in Florida and we have so many patients coming here from Tennessee, Kentucky, Ohio and Georgia and they [DEA] don't like that." Dr. Hall also told CS-2 that he saw 140 patients in one day and that in the last "two weeks, [the physician] banked $12,000 a week."

Defendant's Initials _____     7

CS-2 also made recorded phone calls and held recorded meetings with Rose. During one of the consensually recorded phone calls in mid April, Rose told CS-2 that if CS-2 was hired, the owner would pay CS-2 $4,000 per month to have a professional association in CS-2's name, that CS-2 would see 50 to 60 patients per day and that CS-2 could expect to make about $2,500 to $3,000 per day.  Rose also stated that he consulted with a former DEA agent "about how to conduct business."

Krystopher Legg is from the Columbus, Ohio area.  Multiple witnesses would testify that Krystopher Legg and his associates organized large groups of individuals to travel from the Columbus, Ohio area to a particular pain clinic in the South Florida area (the previously referenced rival clinic to the owner of the Jacksonville pain clinics) to see the doctors at that clinic to obtain large prescriptions of oxycodone (30 milligram and 15 milligram dosages), xanax and, on occasion, soma.  These individuals, who Legg and others recruited, went to a pain clinic in South Florida and saw physicians who prescribed them these significant prescriptions without obtaining any medical documentation concerning the clients/patients other than an MRI provided by the clients/patients, performed no or a minimal/cursory physical examination and did not verify any information the clients/patients provided as to their history of medical prescriptions for pain management, including that for oxycodone.  Typically, no alternative methods of treatment were discussed and no referrals to specialist physicians were made.

It was during this process that Krystopher Legg met the individual who owned the MRI business, who subsequently traveled to Jacksonville, Florida to work with the owner of the Jacksonville pain clinics to make significant sums of money from the

Defendant's Initials _KL_                    8

clients/patients who ceased traveling to South Florida and began stopping in Jacksonville, Florida to see the doctors at the Jacksonville pain clinics. Legg formed a relationship with the owner of the mobile MRI machine. In some instances, patients received an MRI printout with their name and date of birth on it with some findings with respect to what was purported to be an MRI of their back. The owner of the MRI machine gave "specials" to Legg and his associates, including that for every third or fourth person that Legg and his associates presented for an MRI, the next MRI was free.

About when Rose opened Jacksonville Pain, Legg and his associates stopped traveling from Columbus, Ohio to South Florida and instead stopped in Jacksonville, Florida. The owner of the MRI business likewise moved his business to Jacksonville, Florida to service those clients/patients traveling to the Jacksonville pain clinics instead. This relationship continued, in that Legg brought large groups of clients/patients to Jacksonville Pain, then Duval Wellness and also First Coast Pain to see the prescribing physicians. Legg's "sponsored" clients/patients were often moved ahead in line at the clinics on many occasions because Legg and others associated with him paid cash tips to the security guards and employees at the Jacksonville pain clinics. Legg paid for his sponsored clients/patients' MRI, doctor visit fees and the prescribed medications. Legg and others associated with Legg, who profited from this system, did this on a weekly basis for groups of people ranging in number from 10 up to 25. In addition to paying for these clients/patients' fees and costs associated with these visits, Legg paid them individually either between $500 and $1,000 in cash or approximately fifty (50) of the 30 mg oxycodone pills prescribed to them per visit.

Defendant's Initials _____                    9

Prior to seeing the physicians, Legg often provided the clients/patients with synthetic urine that he purchased and then mixed with oxycodone and provided that to his clients/patients in a container so that the client/patient could put the liquid in the urine specimen cup so that the client/patient would test positive for the presence of opiates.  This was to ensure that there was some documentation in the client/patient chart that the patient tested positive for opiates.  In addition, other clients/patients not associated with Legg would testify that they often snuck in condoms full of urine mixed with oxycodone only so that the client/patient would not have to provide his or her own urine specimen, which would have tested positive for marihuana, cocaine, methamphetamine and other drugs.  On numerous occasions, the Jacksonville pain clinics had to call plumbing companies to come out and unclog the toilets and plumbing system because of the amounts of condoms flushed down the toilets.  Even when these incidents occurred, the owners and managers of the clinics did nothing to curtail this activity of the clients/patients.

Legg's clients/patients (and numerous other clients/patients not associated with Legg) saw the various doctors at Jacksonville Pain, and later Duval Wellness and First Coast Pain, who performed cursory (if any) physical examinations, obtained no medical documentation other than the MRI the clients/patients provided and made no independent verification from prior physicians as to the levels of narcotic prescription painkillers (if any) that these clients/patients claimed to be taking or using.  In fact, Legg became personally acquainted with certain physicians who knew when they were seeing "Krys's people" and that these clients/patients were "VIPs" (very important patients).  The physicians normally spent little time with the clients/patients during the

Defendant's Initials _____                    10

initial consultation, and even less in the follow-up visits, which occurred around every 30 days for each client/patient. On many occasions, certain physicians did not even consult with patients appearing for a follow-up visit and had a member of the staff simply print out a new prescription for them. In the significant majority of cases, the physicians prescribed between 240 and 150 30 mg oxycodone tablets (in dosages of either 240, 210, 180 and 150 30mg pills), between 60 and 120 15 mg oxycodone tablets (in dosages of either 60, 90 or 120), between 30 and 90 2 mg xanax tablets (in dosages of 30, 60 and 90 2 mg pills) and, in some instances, varying amounts of soma, all of which were to be taken by the individual client/patient in a 30 day period. For example, if a client/patient obtained 240 30 mg oxycodone pills, 90 15 mg oxycodone pills and 60 2 mg xanax tablets, per the prescription, the client/patient was supposed to take 8 30 mg tablets per day, up to 3 15 mg tablets per day for "breakthrough" pain between taking dosages of 30 mg pills and up to 2 full xanax tablets per day in varying denominations. In oxycodone alone, this is up to 285 milligrams of oxycodone per day. The oxycodone, xanax and soma pills were oftentimes dispensed right out of an in house pharmacy/dispensary inside Jacksonville Pain, Duval Wellness and First Coast Pain. A witness anticipated to be qualified as an expert in internal medicine with a sub-specialty in pain management (who has previously been so qualified in federal courts throughout the United States) will testify, among other things, that such levels of oxycodone are potentially lethal.

When Legg's clients/patients left the Jacksonville pain clinics, they traveled with Legg and others back to Columbus, Ohio. The clients/patients would meet Legg at various locations, including hotels and residences in Columbus, Ohio, and exchange

Defendant's Initials _____          11

their pills for the previously described payments. Legg and others then re-sold the
oxycodone pills (both 30 mg and 15 mg pills) in the Columbus, Ohio area for significant
profits. A single 30 mg oxycodone pill in Columbus, Ohio has a street value of between
$20 and $30 per pill. In many instances, the street value is $1 per milligram of
oxycodone.

On April 19, 2010, a group of Legg's clients/patients traveled from Columbus,
Ohio to Jacksonville, Florida to see the physicians at Duval Wellness. Many of the
clients/patients saw the various physicians at Duval Wellness on April 19; others saw
the physicians at Duval Wellness on April 20. One such individual who saw Dr. Hall on
April 19 at Duval Wellness was Robert Lee Johnson. Witnesses will testify that Robert
Lee Johnson (also known as "pork chop") was a client/patient sponsored by Krystopher
Legg. Johnson had then recently been in jail in the Columbus, Ohio area for a period of
weeks between his March 2010 and April 19, 2010 visit to Duval Wellness. On April 19,
2010 at approximately 6:37 p.m., Dr. Hall issued Robert Lee Johnson the following
prescriptions: 240 30 mg oxycodone pills, 60 15 mg oxycodone pills, 60 2 mg xanax
pills and 60 350 mg soma pills. Robert Lee Johnson's medical chart, which was seized
from Duval Wellness, contains no medical documentation other than an MRI Robert
Lee Johnson provided. There is no record of previous medical history, minimal notes
as to previous evaluations, no notes concerning alternative methods of treatment and
no referral to a specialist. While Robert Lee Johnson's MRI shows minor abnormalities
in the lower back area, none of the abnormalities called for these levels of Schedule II
narcotic painkillers. In addition, relatives of Robert Lee Johnson, including his mother
and widow, would testify that Robert Lee Johnson did not suffer from back pain and had

Defendant's Initials _____                    12

never been prescribed these types of painkillers, but had addiction problems with oxycodone and knew that he could cheaply obtain oxycodone (compared with simply buying oxycodone off the street in Columbus, Ohio) by traveling to Florida in this manner with Krystopher Legg and those associated with Legg.

That night, Legg and Legg's clients/patients from the Columbus, Ohio area stayed at a La Quinta Inn in Jacksonville, Florida. Many of the clients/patients, including Robert Lee Johnson, had their oxycodone and xanax pills in the bags provided to them by the in house dispensary inside Duval Wellness. Robert Lee Johnson maintained custody of the oxycodone and other medications he had been prescribed on April 19. That evening, Robert Lee Johnson consumed alcoholic beverages and oxycodone pills. Late that evening and early in the morning hours of April 20, 2010, Robert Lee Johnson began to show signs of an oxycodone overdose. Individuals associated with Legg told other individuals traveling with them to put Robert Lee Johnson in a cold bath and to place ice on his testicles. Robert Lee Johnson began to respond. Early in the morning hours of April 20, 2010, witnesses saw blood trickling out of Robert Lee Johnson's nose as he laid in the cold bath water inside the La Quinta motel room. Paramedics were called. Robert Lee Johnson died. Legg and others associated with him obtained the pill bottle from Duval Wellness containing Robert Lee Johnson's prescription for the 30 mg and 15 mg oxycodone pills. There were pills missing from the 30 mg oxycodone bottle. The Duval County Medical Examiner and autopsy report reflects that Robert Lee Johnson had a significant amount of oxycodone in his blood. The determined cause of death was an accidental oxycodone overdose. On April 20, even after Johnson died, Legg and his associates

Defendant's Initials _____          13

took the clients/patients to the pain clinics so that they could obtain their oxycodone prescriptions pursuant to the referenced agreement.

During the ensuing months, through about July 28, 2010, Legg and his associates continued to bring large groups of people, sometimes in a bus that Legg purchased, to the Jacksonville pain clinics to obtain oxycodone. Legg and his associates redistributed these pills in the Columbus, Ohio area.

When clients/patients attempting to see the physicians at Jacksonville Pain and Duval Wellness could not be seen due to too many patients arriving at those clinics on a particular day (which regularly exceeded 100 people), staff at Jacksonville Pain and Duval Wellness referred these patients to First Coast Pain. While Jacksonville Pain, and its successor clinic Duval Wellness, and First Coast Pain were separate clinics, there was common ownership - Zachary Rose. These clinics referred clients/patients back and forth. Both clinics also referred the clients/patients to the individual who owned the mobile MRI unit.

On June 23, 2010, six undercover agents from the Drug Enforcement Administration (UCs) traveled with a confidential source (CS-1) to Duval Wellness so that CS-1 could facilitate these UCs seeing physicians at Duval Wellness in a "VIP" (very important patient) capacity. The UCs met with security guards and told a security guard that they were "with [CS1]." The UCs were provided wristbands that would allow them to see physicians at Duval Wellness that day. CS-1 arranged with the Duval Wellness staff for the UCs to be seen by Dr. Hall and Dr. Perla, who were working that day at Duval Wellness. The six UCs prepared patient information forms using undercover names and presented Florida identification with those names. In sum, the

Defendant's Initials _____   14

UCs put very little information in their patient information charts and noted that their pain was significant (at times the worst pain imaginable) when not taking oxycodone and that they had little to no pain when taking oxycodone. The UCs also indicated that they held strenuous "blue collar" type jobs which required manual labor.

In sum, when the UCs saw Dr. Hall and Dr. Perla, they did minimal physical examinations, did not independently verify medical history, did not discuss alternative treatments or referrals to a specialist and only cursorily reviewed the MRIs that the UCs provided (which were actually their own MRIs). These MRIs show little or nothing wrong with the UCs' lower backs. All of the UCs submitted a urine specimen to be tested for the presence of opiates and benzodiazepines (xanax) and oxycodone. All of the UCs tested negative for the presence of those drugs in their system, which indicates that the UCs were not taking any opiates or benzodiazepines at that time. None of the UCs presented any symptoms of withdrawal from those drugs to the doctor who examined them. Despite this and that the examining physician commented to some of the UCs that they appeared "strong" during the cursory physical examination, the physician prescribed significant levels of oxycodone and xanax to the UCs. These prescriptions ranged from 180 30 mg oxycodone pills, 120 15 mg oxycodone pills and 60 2 mg xanax tablets to 120 30 mg oxycodone pills and 90 15 mg oxycodone pills. When the physician prescribed one UC 120 30 mg oxycodone pills, the UC simply asked for more medication and the physician immediately agreed to giving the UC 90 15 mg oxycodone pills. The entire examination that the physician performed on that particular UC lasted for 5 minutes and 22 seconds.

Defendant's Initials _____          15

On July 26, 2010, two Jacksonville Sheriff's Office (JSO) undercover officers went to First Coast Pain and saw Dr. Holland. Similar to the DEA UCs, the JSO UCs used undercover names and identification. The identification cards they presented were from the state of Kentucky. While Dr. Holland spent about twenty minutes apiece with the UCs, Dr. Holland performed no real physical examination. One of the JSO UCs made repeated inconsistent statements about whether he had previously taken oxycodone. During times when the JSO UC stated that he had previously taken oxycodone, the JSO UC then made inconsistent statements concerning whether these oxycodone tablets were prescribed to him, or whether he had intermittently purchased them "off the street." Both JSO UCs provided urine specimens, which tested negative for the presence of any controlled substance (including oxycodone, opiates and benzodiazepines). Notwithstanding the statements of the UC, Dr. Holland never questioned the UC concerning the inconsistencies and never took any steps to independently verify whether a physician had ever prescribed oxycodone to the JSO UC. Dr. Holland did not discuss that the JSO UCs tested negative for the presence of opiates and benzodiazepines in their urine and that the results of the drug tests were inconsistent with the information on their patient charts and statements about having previously taken oxycodone. Dr. Holland prescribed one JSO UC 180 30 mg oxycodone tablets (6 per day), 60 15 mg oxycodone tablets (approximately 2 per day as needed for "breakthrough" pain between dosages of the 30 mg oxycodone) and 60 2 mg xanax tablets (a ½ to 1 tablet 3 times per day); Dr. Holland prescribed the other JSO UC 150 30 mg oxycodone tablets (5 per day), 90 15 mg oxycodone tablets (approximately 3 per day as needed for "breakthrough" pain between dosages of the 30

Defendant's Initials _____                    16

mg oxycodone tablets) and 30 2 mg xanax tablets (a quarter to ½ of a 2 mg tablet 3 times per day).

An individual anticipated to be qualified as an expert witness in internal medicine with a sub-specialty in pain management would testify, after reviewing all of the undercover charts and recordings and over a total of 100 patient files specifically and randomly selected for each of the seven physicians at Jacksonville Pain, Duval Wellness and First Coast Pain, that, with respect to the undercover officers alone, if those officers had taken the oxycodone and xanax prescriptions as prescribed, those officers easily could have died.  The expert will opine that these and other prescriptions written to various patients were issued outside the usual course of medical practice and not for any legitimate medical purpose.

On July 29, 2010, the DEA, FBI and JSO executed in excess of forty (40) search and seizure warrants, including search warrants at the physical locations of Duval Wellness and First Coast Pain.  All patient records inside Duval Wellness and First Coast Pain were seized.  The officers seized $20,726.00 in cash from First Coast Pain.  In addition, numerous bank accounts from SunTrust, Bank of America and Citizens Bank were seized.  These accounts were in the name of various businesses, all of which were a front for cash deposits made from the business of the three Jacksonville pain clinics.  The bank accounts were those of the owner, co-owners and physicians.  The aggregate amount of money seized in the numerous bank accounts was $3,443,968.68.  There were six (6) total accounts seized belonging to Zachary Rose.  The aggregate amount of money seized in those six accounts was $2,248,153.89.  The aggregate amount of money seized from Jenna Crawley (in 3 separate bank accounts -

Defendant's Initials           17

two for Heavy Investments and one for Nico Consulting) was $359,872.23, proceeds from the illicit Jacksonville pain clinics.  The aggregate amount of money seized from a bank account of Jason Votrobek was $57,903.41.  Other large sums of money were likewise seized from the bank accounts of various physicians.  Brian Goldberg, Jason Votrobek, Ryan Young, Theodore Enquist and Yevgeny "Gene" Drubetskoy were signatory to various business accounts for the clinics.  At various times, these individuals counted the large sums of money derived from the patient visits and the substantial number of oxycodone and other pills sold directly from the clinics and then deposited those sums of money (oftentimes in excess of $100,000 cash in one day) in these accounts.  In addition, various vehicles, including a 2007 Mercedes-Benz, a 2010 Land Rover SUV and a 2010 GMC Denali, were seized.

In calendar year 2010, the seven physicians at Jacksonville Pain, Duval Wellness and First Coast Pain all placed in the top 100 practitioners in the United States for units of oxycodone ordered from their particular DEA number.  The seven physicians placed third, fourth, eighth, seventeenth, forty-fifth, fifty-fourth and ninety-fourth on that list.  The total units of oxycodone ordered from these physicians' respective DEA numbers in calendar year 2010 are as follows: 790,880 (Dr. Hall), 670,680 (Dr. Madan), 545,600 (Dr. Tafflin), 468,160 (Dr. Holland), 295,140 (Dr. Brandt), 272,880 (Dr. Perla), and 172,834 (Dr. Posca).

Defendant's Initials _____        18