UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                              CASE NO.  3:11-cr-5(S2)-J-32JRK

DR. TODD PERLA
DR. MARC TAFFLIN
DR. ANTHONY POSCA
DR. ELDON DALE BRANDT
THEODORE JOHN ENQUIST
   a/k/a "Teddy"
JASON COLE VOTROBEK

## UNITED STATES' TRIAL BRIEF

### Introduction

The defendants in this case are charged in a three count indictment.  Only Counts One and Three pertain to the remaining unsevered defendants.  Count One charges the defendants with knowingly and willfully conspiring to distribute Schedule II (Oxycodone), and Schedule IV (Alprazolam (Xanax)), controlled substances, not for a legitimate medical purpose and not in the course of professional medical practice, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(C), and 841(b)(2).  Count Three charges the defendants with knowingly and willfully conspiring to engage in monetary transactions of a value greater than $10,000 in criminally derived property from the specified unlawful activity of conspiring to distribute and dispense oxycodone and alprazolam in violation of Title 18, United States Code, Sections 1956(h) and 1957.

## STATEMENT OF THE CASE

The United States believes the following facts will be proven at trial.

From December 2009 through July 2010, three pain clinics were owned and operated in Jacksonville by co-defendant Zachary Rose.[1] They were: (1) Jacksonville Pain and Urgent Care, located at 1395 Cassat Avenue, Suite 2, Jacksonville, Florida; (2) Duval Wellness Center, Inc., located at 203-9A West 48th Street, Jacksonville, Florida; and (3) First Coast Pain and Urgent Care, located at 5834 Normandy Boulevard, Jacksonville, Florida. Search and seizure warrants were obtained in late July 2010 and executed on numerous bank accounts as well as the physical locations of two pain clinics (Duval Wellness and First Coast Pain and Urgent Care).[2] Approximately $3,443,968.68 was seized upon execution of the seizure warrants, $2,248,153.89 of which came from accounts opened by Zachary Rose.

Rose owned and operated these pain clinics in a partnership with other individuals including Jenna Crawley[3] and Jason Votrobek. In late 2009, Rose opened Jacksonville Pain to obtain a strategic advantage over pain clinics in South Florida. Many of the customers who traveled to pain clinics in Florida were from the states of Ohio, Kentucky and Tennessee. These patients became accustomed to obtaining significant quantities of oxycodone, xanax and soma from pain clinic doctors in South Florida. Rose and other individuals contacted these clients/patients and informed them that they could cut in excess of 600 miles off their trip and stop at Jacksonville Pain in

---

[1] Rose has pleaded guilty and is cooperating.

[2] Jacksonville Pain had closed prior to the issuance of the search warrants.

[3] Crawley has pleaded guilty and is cooperating.

2

Jacksonville, Florida, rather than traveling to the pain clinics in South Florida, and that they could still obtain the levels of oxycodone they were accustomed to receiving.

Dr. Donald Hall, Dr. Todd Perla and Dr. Elio Madan worked at Jacksonville Pain and at Duval Wellness. Dr. Marc Tafflin and Dr. Eldon Brandt also worked there for a period of time. Dr. Thomas Holland, Dr. Tafflin and Dr. Anthony Posca worked at First Coast Pain. These doctors prescribed significant amounts of oxycodone to patients at these clinics. In about an eight (8) month period, approximately 3,216,174 units of oxycodone were ordered and prescribed by the clinics through these seven doctors.

Confidential informants were used to further the investigation and to gather incriminating conversations from a number of the participants. It was learned that many patients were associated with "sponsors" who brought large groups of people from out of state to visit the pain clinics. These groups ultimately turned the pills they obtained from the prescribing physicians over to their "sponsor." In exchange, the "sponsor" paid the fees associated with doctor visits, MRIs and prescriptions (which routinely exceeded $1,000 cash per patient per visit) and an additional monetary fee to the "patient" (or a specific amount of pills).

On June 23, 2010, seven DEA undercover agents and task force officers from South Florida went to Duval Wellness under the guise that they were "sponsored" by one of the informants. The undercover officers saw primarily Doctors Hall and Perla. The visits were surreptitiously audio recorded. The officers brought with them their own MRIs as part of the ruse to test the prescribing doctors' practices. None of the agents had ever been prescribed oxycodone, nor were they currently using oxycodone. The undercover officers all obtained oxycodone from the doctors, with the typical

prescription being 180 30mg oxycodone, between 120-60 15mg oxycodone and Xanax tablets.  All undercover officers prepared a patient evaluation form and, in substance, referenced that they barely experienced any pain whatsoever.  Their examinations were sub-standard at best and, at worst, non-existent.  Additional supporting testimony on the standard of care and practice will be offered by actual clinic patients.

In addition to the bank accounts seized, approximately nine thousand patient files were seized by law enforcement. Some of these files have been reviewed by an expert for the United States who will testify that the prescriptions were not written for a legitimate medical purpose and not in the usual course of medical treatment.  The United States will offer a second expert who will testify to the acceptable medical protocol for the diagnosis and treatment for medical conditions which require pain management intervention.  A third expert will be offered to testify to the street values of 30 and 15 milligram oxycodone pills.

An FBI forensic accountant identified a number of bank accounts related to Jacksonville Pain, Duval Wellness, First Coast Pain, Zachary Rose and other defendants.  Summary charts showing credits greater than $1,000 deposited in these accounts and debits greater than $1,000 transferred from these accounts or used to buy certain items will be offered at trial to support the grand jury's allegation of transactional money laundering as alleged in Count Three.

## Memorandum

As a general overview, a medical practitioner is protected from drug trafficking charges if he/she issues a prescription for a controlled substance for a legitimate medical purpose while acting in the usual course of professional practice.  If the medical

practitioner's conduct falls outside that standard, these protections are lost and the practitioner can be prosecuted for distribution. The usual course of professional practice is an objective standard derived from the way medicine is practiced in the United States.

More specifically, the Controlled Substances Act (CSA) governs the manufacture, distribution, and dispensing of controlled substances in the United States. 21 U.S.C. §§ 801, et seq. The CSA places all substances which are in some manner regulated under existing federal law into one of five schedules. This placement is based upon the substance's medical use, potential for abuse, and safety or dependence liability. Schedule II drugs have a recognized medical benefit, but "require the highest degree of scrutiny and supervision in terms of making sure they don't end up in the wrong hands." United States v. Merrill, 513 F.3d 1293, n. 2 (11th Cir. 2008). Abuse of Schedule II drugs like Oxycodone, for example, may lead to severe physical or psychological dependence. Schedule III and IV drugs have fewer controls.

These substances "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04. 21 C.F.R. § 1306.04, in pertinent part, provides that:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist, who fills the prescription. An order purporting to be a prescription issued not in the usual course of

5

professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Controlled Substances Act (Title 21, United States Code, Section 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions related to controlled substances.

Title 21, United States Code, Section 841(a)(1) provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally to distribute or dispense a controlled substance . . .." To violate section 841(a)(1), a doctor, pharmacist, or other medical professional must have, first, knowingly or intentionally distributed a controlled substance, United States v. Tobin, 676 F.3d 1264, 1280 (11th Cir. 2012), second, known the prescription drugs were controlled substances, and third, distributed or dispensed them in such a way not authorized by the subchapter. United States v. Daniel, 3 F.3d 775, 778 (4th Cir. 1993). The critical element is, of course, the third.

The third element is derived from the statutory scheme and DEA regulations described above. The term "practitioner" includes a physician or pharmacist licensed, registered or otherwise permitted to distribute or dispense controlled substances "in the course of professional practice." 21 U.S.C. § 802(21). And, as stated above, the regulations promulgated under Title 21 provide that a valid prescription for controlled substances "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04.

Although medical professionals who are properly registered under Title 21 generally are permitted to dispense controlled substances,[4] the United States Supreme Court ruled in United States v. Moore, 423 U.S. 122, 124 (1975) that they "can be prosecuted under § 841 when their activities fall outside the usual course of professional practice."  In so ruling, the Supreme Court stated that just because the registrant can also be prosecuted for relatively minor offenses relating to violations of dispensing procedures under other sections of the CSA, "there is nothing in the statutory scheme or the legislative history that justifies a conclusion that a registrant . . . is thereby exempted from prosecution under § 841 for the significantly greater offense of acting as a 'drug pusher.'" Id. at 138.  The Supreme Court stated further that it was the intent of Congress in enacting the CSA "to confine authorized medical practice within accepted limits," and that "physicians who go beyond approved practice remain subject to serious penalties." Id., 423 U.S. at 142-144.  In Moore, the Supreme Court implicitly approved the jury instructions that the trial judge had given that physicians must prescribe "in accordance with a standard of medical practice generally recognized and accepted in the United States" but that "honest effort[s] to prescribe for

---

[4]Citing Moore, the Eleventh Circuit in United States v. Betancourt, 734 F.2d 750 (11th Cir. 1984) stated that "[i]n order to lawfully possess or dispense a controlled substance a doctor must fulfill two requirements.  He must be lawfully licensed to practice medicine and he must be registered by the Drug Enforcement Administration.  Doctors that are registered are then authorized to possess, distribute or dispense controlled substances.  However, they may do so only in the usual course of professional practice and for a legitimate medical purpose." 734 F.2d at 757.

detoxification in compliance with an accepted standard of medical practice" are "not criminal." Id. at 139, 143 n.20.

Most courts have held that the two phrases, "a legitimate medical purpose" and "in the usual course of professional practice" described in 21 C.F.R. § 1304 above are different ways of expressing the same concept. See e.g., United States v. Nelson, 383 F.3d 1231-32 (5th Cir. 2004); United States v. Daniel, 3 F.3d 775, 778 (4th Cir. 1993); United States v. Singh, 54 F.3d 1182, 1187-88 (4th Cir. 1995); and United States v. Plesons, 560 F.3d 890, 896 (8th Cir. 1977). Further, these standards are judged by an objective standpoint. The Eleventh Circuit Court of Appeals has rejected a proposed instruction that defined the standard only in subjective terms. See Tobin, 676 F.3d 1264 at 1280. In United States v. Williams, 445 F.3d 1302, 1309-10 (11th Cir. 2006), the Court held that the district court did not abuse its discretion in refusing to give a proposed jury instruction that failed to include any objective standard by which a physician's prescribing behavior could be judged. The instruction given that "A controlled substance is prescribed by a physician in the usual course of professional practice and, therefore, lawfully, if the substance is prescribed by him in good faith as part of his medical treatment of a patient in accordance with the standard of medical practice generally recognized and accepted in the United States[]" did not seriously impair the physician's ability to present an effective defense. Id. at 1309 (noting that the instruction approved in United States v. Norris, 780 F.2d 1207, 1209 (5th Cir. 1986) -the same instruction given in Williams - was a correct statement of law under Moore as both provided both subjective and objective measures of the prescribing behavior). In Moore, the trial court also gave the standard "good faith" defense instruction. The

Eleventh Circuit reaffirmed the ruling in Moore that the "appropriate focus is not on the subjective intent of the doctor, but rather rests upon whether the physician prescribes medications "in accordance with a standard of medical practice generally recognized and accepted in the United States."" United States v. Merrill, 513 F.3d 1293, 1306 (11th Cir. 2008). Merrill also addressed whether the burden was improperly shifted to the defendant with regard to the good faith defense, and held that the jury was properly instructed that it is the government's burden to prove beyond a reasonable doubt that the "doctor's actions were not for legitimate medical purposes in the usual course of professional medical practice or were beyond the bounds of professional medical practice." Id.

There are no specific guidelines and no definition in the law or regulations of the terms or phrases "outside the scope of professional practice" and "not for a legitimate medical purpose." Instead, "the courts must engage in a case-by-case analysis of evidence to determine whether a reasonable inference of guilt may be drawn from specific facts." United States v. August, 984 F.2d 905, 713 (6th Cir. 1992). Several factors have been recognized by the courts in evaluating whether a prescription for controlled substances issued by a physician or dispensed by a pharmacy exceeds the bounds of "the usual course of professional practice" and supports convictions under sections 841(a)(1) and 846. Some of these factors, as they relate to physicians, many of which are present in this case, include:

       1. Inadequate or no physical examinations;

       2. ignoring results of tests that were given;

       3. no precautions taken against misuse or diversion;

9

4. no regulation of dosage;

5. prescribing as much and as frequently as the patient demanded;

6. graduated fee based on number of tablets desired.

<u>United States v. Moore</u>, 423 U.S. 122, 142-43 (1975) (physician conviction).

## **CONCLUSION**

Other than routine evidentiary objections, the United States is unaware of any significant legal issues involving this indictment and its presentation to a jury.

        Respectfully submitted,

        ROBERT E. O'NEILL
        United States Attorney

By: *s/ Jay Taylor*
     JAY TAYLOR
     Assistant United States Attorney
     Florida Bar No. 0511730
     300 N. Hogan Street, Suite 700
     Jacksonville, Florida 32202-4270
     Telephone: (904) 301-6300
     Facsimilie: (904) 301-6310
     E-mail: jay.taylor@usdoj.gov

**United States v. Dr. Todd Perla, et al**  Case No. 3:11-cr-5(S2)-J-32JRK

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2013, I electronically filed the foregoing with the clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

| | |
|---|---|
| John Stokes, Esq.<br>Counsel for Perla | Brook Butler, Esq.<br>Counsel for Votrobek |
| David Barksdale, Esq.<br>Counsel for Tafflin | Bernard Cassidy, Esq.<br>Counsel for Posca |
| Michael Keith Roberts, Esq.<br>Counsel for Brandt | Robert Willis, Esq.<br>Counsel for Enquist |

*s/ Jay Taylor*
JAY TAYLOR
Assistant United States Attorney